# United States Court of Appeals for the Fifth Circuit

————————

No. 23-60101

————————

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit

**FILED**

February 29, 2024

Lyle W. Cayce
Clerk

*Plaintiff—Appellee*,

*versus*

ARTHUR WILSON,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 5:19-CR-11-1

———————————————————————

Before STEWART, CLEMENT, and HO, *Circuit Judges*.

PER CURIAM:[*]

Arthur Wilson was convicted after a jury trial of one count of conspiracy to possess with intent to distribute methamphetamine and one count of conspiracy to commit money laundering. He now appeals his convictions and sentence on numerous grounds. Because we conclude that there was no reversible error in the proceedings below as to his convictions or sentence, we AFFIRM.

————————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-60101

## I. Factual & Procedural Background

Wilson was arrested on September 27, 2018,[1] and subsequently charged in a superseding indictment with conspiracy to possess with intent to distribute 500 grams or more of methamphetamine[2] and conspiracy to commit money laundering.[3] He pleaded not guilty and proceeded to a four-day jury trial which took place from August 23 through August 26, 2022. He was convicted by the jury on both counts and incarcerated on August 26, 2022. The district court sentenced him below Guidelines to two consecutive terms of 240 months and 60 months of imprisonment with two concurrent supervised release terms of five and three years.

The following is a summary of the events leading up to Wilson's arrest as provided in the record, including but not limited to the Presentence Investigation Report ("PSR") and the testimony provided by various witnesses at trial. On March 3, 2017, a postal inspector in Natchez, Mississippi, became suspicious of a package that had been shipped from San Bernadino, California that appeared to be a shipment of drugs. After a canine alert confirmed the inspector's suspicions, a search warrant was obtained, and it was confirmed through subsequent laboratory analysis that the package contained methamphetamine. Postal inspectors then identified other suspicious packages that had been shipped to Natchez from areas near San Bernadino and ultimately determined that those packages also contained methamphetamine.

To identify additional similar shipments, postal inspectors developed a spreadsheet that listed parcels shipped to Natchez from locations in or

---

[1] Wilson was released on bond the same day as his arrest.

[2] 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A).

[3] 18 U.S.C. § 1956(h).

around San Bernadino from 2016 through 2019, including Moreno Valley, California, where Wilson lived. All of the shipments listed in the spreadsheet were paid for with cash, which postal inspector Dominic Riley later testified was typical "when people send narcotics." The postal inspector recognized a pattern of shipments "almost every two weeks or so," which would pause and then resume "another two weeks at a time." The weights of the packages also appeared to be consistent with those of drug shipments according to the postal inspector's training and experience.

Due to the pattern of suspicious shipping activity from areas in and near San Bernadino to Natchez, postal inspectors contacted the Drug Enforcement Administration ("DEA"). In response, DEA Special Agent Pilot Raymond Harper, along with the Mississippi Bureau of Narcotics ("MBN"), began investigating drug-trafficking activities in the Natchez area. Agent Harper testified that on April 21, 2017, the MBN participated in a controlled purchase of methamphetamine from a narcotics dealer, Sammy Wright, during which a confidential informant bought 56 grams of methamphetamine from Wright. Through wiretapped conversations of Wright's cellular phone, agents identified Kevin Singleton as Wright's methamphetamine supplier. Based on various intercepted calls and surveillance, agents also identified Jimmie Swearengen and Wesley Bell as drug traffickers operating in the Natchez area. Agents later intercepted two calls between Wilson and Singleton, on October 7, 2017 and October 24, 2017, during which the pair discussed methamphetamine and cocaine.

Bell subsequently testified that from 2016 through 2018, he sold methamphetamine and other drugs in Natchez and that Wilson was his supplier for the methamphetamine. At times, Bell paid Wilson upfront for the methamphetamine, and other times Bell paid Wilson after selling the methamphetamine. Bell explained that during that time period, Wilson lived in Moreno Valley and would mail packages of methamphetamine to Bell in

No. 23-60101

Natchez to resell. Wilson shipped the packages to Bell at his address in Natchez and to various other addresses around the area. Bell testified that he received packages containing methamphetamine from Wilson about twice a month. He estimated that the largest package he ever received weighed about four pounds, and the smallest package weighed about one pound. After Wilson mailed a package, he would send tracking information to Bell to ensure that Bell received it.

Bell ultimately introduced Wilson to Swearengen and after that point, Bell and Swearengen worked together to sell methamphetamine that Wilson supplied for them. Bell then began paying either Swearengen or Wilson after selling a quantity of methamphetamine, depending on the circumstances. In a later search of Bell's residence, agents found numerous receipts documenting transfers of money, including payments to Wilson.

Another narcotics dealer, Thomas Jerome Mitchell, testified at trial that from 2016 through 2018, he lived in Victorville, California, and that he sold methamphetamine, through Bell, in the Natchez area. Bell paid Mitchell in advance for the methamphetamine, and then Mitchell would ship the methamphetamine to Bell in Natchez. Mitchell testified that on October 5, 2016, Wilson transferred money into an account in the name of Justine Chambers, Mitchell's then-girlfriend.[4] Mitchell explained that Wilson sent the money to both Chambers and Mitchell on behalf of Bell and that the payment was for drugs. Chambers corroborated Mitchell's testimony at trial.

Swearengen testified at trial that from 2016 until 2018 he sold methamphetamine and marijuana in the Natchez area and that Wilson was his methamphetamine supplier. Swearengen testified that Bell introduced him to Wilson and that after Swearengen and Wilson began working together,

_____

[4] Chambers and Mitchell were married by the time of Wilson's trial.

4

Wilson started mailing packages of methamphetamine to Swearengen on consignment, meaning that he distributed the drugs first and sent payment to Wilson after distribution. Swearengen explained that, although he lived in Texas, he would drive from Texas to retrieve the packages that Wilson sent to Natchez, give the methamphetamine to other dealers to distribute in that area, and then mail payment to Wilson or deposit payment directly into Wilson's bank accounts in Texas. Swearengen stated that he and Bell worked together to sell methamphetamine and that the two would supply each other with methamphetamine if one had a supply that was running low.

Swearengen also discussed the various ways he paid Wilson for methamphetamine including sending payment to a Wells Fargo account, a Bank of America account, and a money market account. He testified that Wilson supplied him with the numbers for these accounts. He further testified that he and Wilson decided to limit his (Swearengen's) deposits in Wilson's accounts to under $10,000 to avoid reporting requirements and triggering scrutiny from the bank. After that point, they agreed "to split the deposits" of larger sums into smaller sums so that none of the deposits would exceed $10,000. For example, on November 7, 2016, Swearengen made identical deposits of $9,450, into Wilson's Bank of America account and his Wells Fargo account; and on January 24, 2017, he deposited $8,100 into Wilson's Bank of America account and $6,100 into his Wells Fargo account.

A financial analyst with the Department of Justice Organized Crime Drug Enforcement Task Force, Joseph Ken Roberts, testified regarding the various ways that funds were deposited into Wilson's financial accounts to avoid detection. He corroborated Swearengen's testimony that he had limited his deposits to less than $10,000 in Wilson's various bank accounts. Agent Roberts also testified regarding the process by which Wilson withdrew the funds deposited into his accounts, explaining that he purchased California cashier's checks made out to third parties on the accounts into

which the cash had been deposited in Texas. Roberts confirmed that financial institutions are required to report transactions over $10,000 by filing a "currency transaction report" that captures certain data, including the name of the depositor, the bank, the bank account number, the account holder, and the parties involved in the transaction.

*A. Pretrial Proceedings & Jury Trial*

As discussed, after his arrest in September 2018, Wilson was charged in a superseding indictment with conspiracy to possess with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). He pleaded not guilty, and a four-day jury trial was set to be held in late August 2022.

Around August 2, 2022, Wilson filed a motion to substitute counsel, contending that his defense counsel, Michael Cory, informed him (Wilson) that he would likely lose at trial and that he should accept the Government's plea offer. Wilson interpreted this advice as Cory having no confidence in his defense, so he moved for substitute counsel. The district court addressed Wilson's motion in a pretrial conference and denied it. Wilson then indicated to the court that he would be retaining private counsel.

On August 12, 2022, attorney Wesley T. Evans filed a motion stating that he had been retained by Wilson and asking to be substituted as counsel of record. The Government opposed the motion. The district court granted the motion in part and denied it in part, explaining that (1) the case was over three years old, (2) Wilson had been represented by a total of three attorneys during that time and now wanted a fourth one, and (3) his trial had been previously continued numerous times. The district court reasoned that any breakdown in communication between Wilson and his defense counsel, Cory, was likely Wilson's fault. The district court further pointed out that

this was not the first time Wilson had sought a new attorney on the eve of trial, and that substituting new counsel at this stage in the proceedings would further delay trial. The district court also expressed concern over managing its own docket, emphasizing that it could not, at Wilson's whim, reschedule a complex, lengthy trial at which the Government was expected to call over thirty witnesses. The district court ruled that Cory would remain as lead counsel, but that Evans could sit at the defense counsel's table and assist Cory.

Thereafter, the four-day trial proceeded with approximately twenty witnesses testifying for the Government.[5] Wilson neither testified nor offered any evidence in his defense. Instead, at the close of the Government's case, Wilson moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), arguing that the evidence was insufficient to support his convictions on both counts. The district court denied the motion. The jury found Wilson guilty on both counts. After trial, Wilson again moved for a judgment of acquittal and a new trial. The district court denied his motion and proceeded to sentencing.

*B. Sentencing*

Pursuant to U.S.S.G. § 3D1.2(c), the probation officer grouped the drug conspiracy and money laundering conspiracy counts and calculated a base offense level of 38 based on a converted drug weight of 152,482 kilograms. This weight was determined based on the quantities of methamphetamine discovered in three intercepted packages that were mailed from California to Natchez; Bell's estimate that Wilson supplied him with, at minimum, a pound of methamphetamine twice a month from 2016

---

[5] The Government's witnesses included several DEA Agents, the postal inspector (Riley), Swearengen, Chambers, Singleton, Mitchell, Bell, and others.

until 2018;[6] and Swearengen's estimate that Wilson supplied him with a total of approximately 18 pounds of methamphetamine during the same timeframe.

The probation officer then recommended a two-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B) because Wilson was convicted of money laundering under 18 U.S.C. § 1956; a two-level enhancement under U.S.S.G. § 2S1.1(b)(3) because the money laundering involved sophisticated laundering; a four-level enhancement under U.S.S.G. § 3B1.1(a) because Wilson acted as an organizer or leader of a criminal activity involving five or more participants; and a two-level enhancement under U.S.S.G. § 3C1.1 because Wilson obstructed justice. After a three-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1, Wilson's adjusted offense level was 48, which was treated as a total offense level of 43. *See* U.S.S.G., Ch. 5, Pt. A, cmt. (n.2). The PSR indicated that the nature and circumstances of the offense, Wilson's history and characteristics, and the need for the sentence to provide just punishment could warrant a variance or a sentence outside the guidelines range.

Wilson filed objections to the PSR, asserting that the drug quantity was overstated and that the enhancements involving sophisticated laundering, his organizer/leader role in the offense, and obstruction of justice were inapplicable. He also filed a sentencing memorandum requesting a downward variance of 120 months of imprisonment based on the 18 U.S.C. § 3553(a) sentencing factors, including the need to avoid unwarranted sentencing disparities between himself and his codefendants, Bell, Swearengen, Chambers, and Mitchell.

---

[6] The total amount of methamphetamine calculated to have been supplied by Wilson to Bell was approximately 72 pounds or 32.66 kilograms.

No. 23-60101

At the sentencing hearing, Wilson first challenged the drug-quantity calculation, asserting that he should not be held responsible for the quantity of methamphetamine in the three intercepted parcels, the quantity supplied to Bell, and the quantity supplied to Swearengen because the trial testimony supporting those quantities was unreliable. The district court sustained Wilson's objection as to two of the packages[7] but overruled his remaining objections to the drug quantity, noting that his guidelines range remained the same regardless.

Wilson further argued that the money laundering scheme was not sophisticated because his down-level dealers simply sold drugs for cash and then deposited that cash into various financial accounts. He conceded, however, that his actions constituted sophisticated laundering pursuant to this court's precedent. The district court overruled Wilson's objections to the sophisticated-laundering enhancement.

Wilson also asserted that the enhancement for his organizer/leader role in the offense was unwarranted. In support, he argued that he did not control Bell and Swearengen but simply sold them methamphetamine. The district court again disagreed and overruled Wilson's objection.

Regarding the obstruction of justice enhancement, the Government called DEA Special Agent Jeremiah Rayner to testify. Agent Rayner testified that he interviewed Wilson's codefendants, Bell, Swearengen, and Mitchell, who were housed in the same facility as Wilson but in different pods, about death threats they had received from Wilson. Agent Rayner stated that during their interviews, Bell, Swearengen, and Mitchell all explained that Wilson made certain threatening hand gestures towards them, indicating that

_____

[7] The district court continued to hold Wilson responsible for the quantity of methamphetamine found in a package that was intercepted on February 27, 2017.

he intended to kill them or have them killed.[8] Bell also stated that Wilson sent messages to him through other inmates that he (Wilson) planned to have Mexican inmates kill or put a hit on Bell, and that Wilson expressed these same sentiments directly to Mitchell.

Wilson testified in his own defense at the sentencing hearing and denied that he made any threatening hand gestures or that he threatened to kill any of his codefendants. He further asserted that because the alleged threats occurred after he had already been convicted, he could not have been attempting to obstruct an ongoing investigation. He also argued that because none of the pertinent codefendants were expected to testify at sentencing, he could not have been attempting to obstruct sentencing. The district court disagreed and overruled Wilson's objection to the obstruction-of-justice enhancement.

At the end of the sentencing hearing, the district court stated that, based on Wilson's total adjusted offense level of 43, and criminal history category of one, the guidelines range was life in prison. The Government requested that the district court impose a within-guidelines sentence. However, after hearing sympathetic testimony from Wilson's wife, Wilson's request for mercy, and his defense counsel's request for a downward variance, the district court sentenced Wilson below the guidelines range to 240 months in prison on the drug conspiracy conviction and to 60 months in prison on the conviction for conspiracy to commit money laundering, to run consecutively. The district court also imposed concurrent five-year and

---

[8] For example, Wilson would move his hand or fingers across his throat as if he was slitting it, form his fingers into a gun and aim it at the codefendants, or rub his fingers together like he was demanding payment.

three-year supervised release terms. The district court concluded the sentencing hearing by stating:

> [T]he court will note that if it has erred in the calculation of [the] sentencing guidelines, the court would have imposed this same sentence as a variance based on the offense conduct in this case, the characteristics of this defendant, and the other factors found [in 18 U.S.C. § 3553].

Wilson filed this appeal.

## II. DISCUSSION

On appeal, Wilson raises eight arguments, challenging both his convictions and sentences. More specifically, he claims that: (1) the evidence was insufficient to support his conviction for conspiracy to possess with intent to distribute methamphetamine; (2) the evidence was insufficient to support his conviction for conspiracy to commit money laundering; (3) the district court erred in denying his motion to substitute counsel; (4) the district court improperly calculated his base offense level; (5) the district court erred in applying the sophisticated-laundering enhancement; (6) the district court erred in applying an enhancement on grounds that Wilson was an organizer or leader in the criminal enterprise; (7) the district court erred in applying the obstruction-of-justice enhancement; (8) and the district court erred in rendering a disproportionate sentence to Wilson relative to his codefendants. We address each of his arguments in turn and reject them all.

### A. Sufficiency of the Evidence

"Our sufficiency review is highly deferential to the jury's verdict." *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022). "We will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt." *Id.* at 279. We do not reevaluate the weight of the evidence or the witnesses' credibility. *United States v. Fields*, 977 F.3d 358,

363 (5th Cir. 2020). Moreover, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence; the jury is free to choose among reasonable constructions of the evidence." *Id.*

### (1) Drug Conspiracy Conviction

Wilson first argues that the evidence was insufficient to support his conviction for conspiracy to possess with intent to distribute methamphetamine in violation 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A). He asserts that although cooperating witnesses testified that he was involved in distributing methamphetamine in Mississippi, their testimonies were inconsistent and unreliable. He further contends that the Government presented no testimony linking him to any specific shipment of methamphetamine, that his codefendants' testimonies were uncorroborated, and that, at most, the trial testimony established a buyer-seller relationship between himself and each coconspirator. We are unpersuaded by his arguments.

Wilson moved for a judgment of acquittal at the close of the Government's case, which was the close of all of the evidence. *See* FED. R. CRIM. P. 29(a). Thus, we review his sufficiency-of-the-evidence challenge de novo, viewing "the evidence and the inferences drawn therefrom in the light most favorable to the verdict." *Fields*, 977 F.3d at 363.

To show a drug conspiracy, the Government must prove beyond a reasonable doubt: "(1) the existence of an agreement between two or more persons to violate narcotics laws; (2) the defendant's knowledge of the agreement; and (3) his voluntary participation in the conspiracy." *United States v. Valdez*, 453 F.3d 252, 256–57 (5th Cir. 2006). "One becomes a member of a drug conspiracy if he knowingly participates in a plan to distribute drugs, whether by buying, selling or otherwise." *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993).

"The buyer-seller exception prevents a single buy-sell agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs." *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc). "The rule shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for distributers." *Id.* When a defendant participates in multiple narcotics transactions, however, "this exception cannot cover him." *See United States v. Escajeda*, 8 F.4th 423, 426 (5th Cir. 2021) (observing that because the defendant "made two sales to the government informant," the buyer-seller exception did not apply).

The evidence here, when viewed in the light most favorable to the verdict, was sufficient to support Wilson's conviction for conspiracy to possess with intent to distribute methamphetamine. *See Fields*, 977 F.3d at 363. Bell and Swearengen both testified that over the course of three years, from 2016 through 2018, they sold methamphetamine in the Natchez area and that Wilson had supplied them with the methamphetamine they sold there. They further testified that Wilson routinely mailed packages of methamphetamine from California to their locations in Natchez and provided them with relevant tracking information so they could retrieve the packages and sell the narcotics contained therein. Receipts found in Bell's home showed that he made numerous payments to Wilson. Swearengen testified at length that he routinely deposited money from drug sales into Wilson's various bank accounts and that Wilson provided him with the accounting information to allow him to do so. This evidence was sufficient to support Wilson's conviction for conspiracy to possess with intent to distribute methamphetamine in violation 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A). *See Valdez*, 453 F.3d at 256–57.

Although Wilson contends that his codefendants' testimony is insufficient to support his conviction because these witnesses are unreliable

coconspirators and career drug dealers, "it is well-established in this circuit that a defendant may be convicted based upon the uncorroborated testimony of a co-conspirator." *United States v. Rasco*, 123 F.3d 222, 229 (5th Cir. 1997). Furthermore, we have upheld guilty verdicts on this basis "even if the witness is interested due to a plea bargain or promise of leniency," except in circumstances where "the testimony is incredible or insubstantial on its face." *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994). We have likewise reasoned that "[t]estimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Id.*

Although the drug-dealing past of these witnesses and their possible motives for testifying were brought out at trial, the jury nevertheless found them credible as demonstrated by its verdict. As we have stated, we will not reevaluate the weight of the evidence or the witnesses' credibility as determined by the jury. *Fields*, 977 F.3d at 363; *see also United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008) (noting that this court does "not weigh evidence or assess the credibility of witnesses, and the jury is free to choose among reasonable constructions of the evidence").

Wilson's argument that he should be shielded from liability under this court's buyer-seller exception fares no better because his numerous drug sales to Bell and Swearengen render the exception inapplicable. *See Escajeda*, 8 F.4th at 426; *see also United States v. Wiseman*, 576 F. App'x 376, 379 (5th Cir. 2014) (unpublished) (explaining that the "the buyer-seller exception generally applies to a single buy-sell agreement" (internal quotation marks and citation omitted)).

For these reasons, we hold that the evidence presented at trial was sufficient to support Wilson's jury trial conviction for conspiracy to possess with intent to distribute methamphetamine. *See Fields*, 977 F.3d at 363.

*(2) Money Laundering Conviction*

Wilson next argues that the evidence was insufficient to support his conviction for conspiracy to commit money laundering. He asserts that the Government presented no evidence demonstrating that he agreed with anyone to conceal or disguise the nature, location, source, ownership, or control of the drug proceeds deposited into his bank accounts. He further contends that no evidence was presented showing that he agreed with anyone to take steps to avoid a transaction reporting requirement. In support of his position, he emphasizes that he had no control over when or how the money from the drug sales were deposited into his bank accounts. We disagree.

Under 18 U.S.C. § 1956(a)(1)(B), it is unlawful to commit money laundering which is described as conducting or attempting to conduct a "financial transaction" involving the "proceeds" of unlawful activity "knowing that the transaction is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity" or "to avoid a transaction reporting requirement under State or Federal law." In terms of establishing "conspiracy to commit money laundering, the Government must prove (1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Cessa*, 785 F.3d 165, 173 (5th Cir. 2015) (internal quotation marks and citation omitted).

Here again, the evidence presented by the Government, when viewed in the light most favorable to the verdict, was sufficient to support Wilson's conviction for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Swearengen testified that after selling the methamphetamine he obtained from Wilson, he deposited the monetary

proceeds into Wilson's various bank accounts. He further explained that, to avoid detection and bank reporting requirements, the two agreed that Swearengen's deposits would not exceed $10,000. Swearengen then followed this procedure by splitting his deposits into Wilson's accounts, *i.e.*, depositing sums less than $10,000 into each account. Thereafter, to further avoid detection, Wilson would withdraw the illegal funds by using cashier's checks made payable to third parties.

This evidence was sufficient to support Wilson's conviction for conspiracy to commit money laundering. *See, e.g.*, *United States v. Brown*, 553 F.3d 768, 787 (5th Cir. 2008) (determining that the Government presented sufficient evidence to support its charge of money-laundering concealment when it showed that the "transactions were in cash so that they were not easily tracked" and that "[m]ost deposits were below ten thousand dollars so as to avoid setting off any reporting requirements that might then lead to unwanted attention concerning the funds' nature"); *United States v. Pipkin*, 114 F.3d 528, 534 (5th Cir. 1997) ("[Defendant's] purchase of the cashier's check was more than an innocent isolated transaction. Rather, the purchase was part of a larger scheme designed to conceal illegal proceeds.").

For these reasons, we hold that the evidence presented at trial was also sufficient to support Wilson's conviction for conspiracy to commit money laundering. *See Fields*, 977 F.3d at 363.

*B. Motion to Substitute Counsel*

Wilson next argues that the district court erred in denying his motion to substitute appointed counsel with retained counsel in violation of his Sixth Amendment right to counsel of his choosing. While he acknowledges that he filed the motion to substitute only a week before trial, he nevertheless asserts that he was not attempting to delay trial. Rather, he explains that substitute counsel was necessary to ensure that he was represented by counsel who was

confident in his case because his previous counsel told him he would lose at trial and should take the Government's plea offer. We disagree.

We review the district court's denial of a motion to substitute counsel for abuse of discretion. *See United States v. Jones*, 733 F.3d 574, 587 (5th Cir. 2013). The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. This includes the "right of a defendant who does not require appointed counsel to choose who will represent him." *Jones*, 733 F.3d at 586 (quoting *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006)). However, "[t]here are limits on this right." *Id.* at 586.

District courts are afforded "wide latitude in balancing the right to counsel of choice against the needs of fairness and . . . the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (internal quotation marks and citation omitted). In evaluating the fairness of a district court's decision on a motion to substitute counsel, we have held that relevant factors to consider include (1) whether a continuance would be required; (2) whether the party's concerns were factual in nature; (3) whether the party requested substitution of counsel late in the case; and (4) whether "a continuance could compromise the availability of" key witnesses. *Jones*, 733 F.3d at 587–88.

Here, Wilson moved to substitute appointed counsel with retained counsel ten days before trial. In denying the motion in part, the district court reasoned that the case had been pending for over three years for criminal conduct that occurred six years prior. It further observed that Wilson had three attorneys during those three years and now wanted a fourth one on the eve of trial. It further noted that the trial date had been continued numerous times and the case was complex, involving approximately thirty potential witnesses and voluminous discovery. For these reasons, the district court explained, if this fourth motion to substitute was granted, a lengthy

continuance would be necessary for new counsel to properly prepare for trial which could compromise the availability of witnesses. The district court emphasized that it suspected that "there is no actual problem with Cory's representation, but rather," because Wilson had been released on bond, his purpose in requesting new counsel was to delay the trial. The district court further noted that it had concerns about managing its own docket due to the many other criminal trials that were set over the next few months. The district court concluded that Wilson had not shown the requisite good cause and denied in part and granted in part his motion, ruling in compromise that Cory would remain as lead counsel, but that Evans could assist Cory and sit at the defense table.

The district court's aforementioned reasoning confirms that each of the factors in *Jones*, and its concerns about "the demands of its own calendar," all weighed against granting Wilson's motion for a continuance. *See Jones*, 733 F.3d at 587–88; *Gonzalez-Lopez*, 548 U.S. at 152. Therefore, we hold that the district court did not abuse its discretion in denying Wilson's fourth request for substitute counsel a week before trial. *See Gonzalez-Lopez*, 548 U.S. at 152; *see also United States v. Silva*, 611 F.2d 78, 79 (5th Cir. 1980) ("The freedom to have counsel of one's own choosing may not be used for purposes of delay. Last minute requests are disfavored." (internal citation omitted)).

### C. Sentencing

Wilson advances a number of arguments related to the district court's calculation of his sentence and its applicability of various sentencing enhancements. We address each of his sentencing arguments in turn, again, rejecting all.

We review the district court's factual findings for clear error and its interpretation of the Guidelines de novo. *United States v. Mauskar*, 557 F.3d

219, 232 (5th Cir. 2009). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (internal quotation marks and citation omitted). "The district court's calculation of the quantity of drugs involved in an offense is a factual determination" that is "entitled to considerable deference and will be reversed only if [it is] clearly erroneous." *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005) (internal quotation marks and citation omitted). "The [G]overnment must prove the facts underlying a sentencing enhancement by a preponderance of the evidence." *United States v. Serfass*, 684 F.3d 548, 553 (5th Cir. 2012).

### (1) Calculation of Base Offense Level

Wilson asserts that the district court erred in its calculation of his base offense level because the drug-quantity calculation was not supported by a preponderance of the relevant and reliable evidence. In particular, he asserts that he should not have been held responsible for the quantity of methamphetamine found in the package that was intercepted on February 27, 2017, because there is no evidence that he personally shipped that package. He further asserts that 72 pounds of methamphetamine (two pounds a month for 36 months) should not have been attributed to him on the basis of Bell's testimony because other witnesses testified that in 2017 and 2018, Bell was receiving methamphetamine from Mitchell. Again, we are unpersuaded by Wilson's arguments.

For sentencing purposes, we have held that "[a] district court may consider estimates of the quantity of drugs for sentencing purposes" and "may extrapolate the quantity from any information that has sufficient indicia of reliability to support its probable accuracy." *Valdez*, 453 F.3d at 267 (internal quotation marks and citation omitted). Testimony from a coconspirator qualifies as reliable, even if drug-quantity estimates are not exact. *Id.*; *United States v. Alford*, 142 F.3d 825, 832 (5th Cir. 1998) (holding

that the PSR's drug-quantity determination was sufficiently reliable even though it was based on a coconspirator's "imprecise" testimony); *see also United States v. Villegas*, 350 F. App'x 904, 905 (5th Cir. 2009) (concluding that the district court's extrapolation of the quantity of unseized methamphetamine was plausible where it relied on a coconspirator's estimates and an agent's statement on profits received from the sale of the methamphetamine).

Here, the record indicates that the February 2017 package was mailed from California to Natchez, Mitchell testified that he did not send the package, and based on this testimony, the district court at sentencing concluded that Wilson sent the package. Given Mitchell's uncontroverted testimony that he did not mail the package and Bell's testimony that Wilson routinely supplied him with methamphetamine in 2017 by mailing it to Natchez, we hold that the district court's determination that the package was mailed by Wilson was plausible in light of the record as a whole. *See Betancourt*, 422 F.3d at 246.

As to the 72 pounds attributed to Wilson based on Bell's testimony, Bell testified that from 2016 until 2018, he was a methamphetamine dealer and that Wilson supplied him with the drug for those three years. He explained that he received shipments from Wilson about twice a month and that each shipment weighed between one and four pounds. Additionally, Bell testified that Wilson was his "go-to source for drugs," and that in 2016, 2017, and 2018, Bell made consistent payments to Wilson for methamphetamine. Bell's testimony supports an estimated drug quantity of about 72 pounds, which is a conservative estimate. As the district court stated at sentencing, "I would rather err on the side of caution for the purpose of sentencing, and that's what I intend to do."

Accordingly, in light of the record as a whole, we hold that the district court's factual finding as to the drug quantity was plausible and does not amount to clear error. *See Betancourt*, 422 F.3d at 246; *see also Valdez*, 453 F.3d at 267.

### (2) Sophisticated-Laundering Enhancement

Wilson further asserts that the district court erred in applying a two-level enhancement under U.S.S.G. § 2S1.1(b)(3) on grounds that his drug activities involved sophisticated laundering. Wilson specifically contends that funds were deposited into his personal accounts and that there is no evidence that he engaged in layering to make the illegal funds appear legitimate. According to Wilson, he merely used simple and unsophisticated means to avoid reporting requirements by breaking large sums into smaller deposits. His arguments fail.

Whether an offense involved sophisticated means is a factual determination that we review for clear error. *United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008). Under U.S.S.G. § 2S1.1(b)(3), a two-level enhancement applies to offenses involving "sophisticated laundering." "[S]ophisticated laundering" is defined as "complex or intricate offense conduct pertaining to the execution or concealment of the [money laundering] offense." U.S.S.G. § 2S1.1, cmt. (n.5(A)); 18 U.S.C. § 1956. "Sophisticated laundering typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.*, layering) of transactions . . . [or] transfers . . . involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." U.S.S.G. § 2S1.1, cmt. (n.5(A)). However, we have upheld application of the enhancement even when none of those factors were present. *See United States v. Chon*, 713 F.3d 812, 823 (5th Cir. 2013) ("Maintaining two sets of books, skimming income on a daily basis, and disguising alien-smuggling proceeds as 'parking income'

in an attempt to make the criminally derived funds appear legitimate are sufficiently complex [actions] to support the enhancement here.").

The record reflects that Swearengen made numerous deposits from drug proceeds into Wilson's multiple bank accounts in Texas although Wilson lived in California. The two agreed that each deposit should not exceed $10,000 to avoid reporting requirements and triggering scrutiny from the bank. Swearengen followed the agreed-on procedure by splitting the deposits, *i.e.*, making individual deposits that were less than $10,000. Wilson later used cashier's checks payable to third parties to withdraw the funds to distance himself from the drug proceeds. This use of multistep transactions to avoid reporting requirements and detection was sufficient to justify the two-level sophisticated-laundering enhancement under this court's precedent. *See United States v. Charon*, 442 F.3d 881, 891–92 (5th Cir. 2006) (concluding that the defendant, a drug dealer, engaged in sophisticated laundering when he opened various financial accounts, made cash deposits into those accounts, and asked a third party to purchase a cashier's check and property to hide the criminal proceeds). Accordingly, we hold that that the district court did not clearly err in applying the two-level sophisticated-laundering enhancement. *See id.* at 892; *see also Conner*, 537 F.3d at 492.

### *(3) Organizer/Leader Enhancement*

Wilson next contends that the district court erred in applying a four-level enhancement under U.S.S.G. § 3B1.1(a) on grounds that he was a leader or organizer in a criminal activity that involved five or more participants. Wilson asserts that there was no evidence that he exercised control over any participant and that he was only a middleman, purchasing drugs from an unspecified supplier and then distributing them to Bell and Swearengen. He asserts that these two drug dealers were free to purchase, and did purchase, their methamphetamine from other sources. Finally, Wilson contends that

the trial testimony showed that he dealt with only Bell and Swearengen and thus was not an organizer or leader of a criminal activity involving five or more participants as required under § 3B1.1(a). His arguments are without merit.

The district court's determination that a defendant is a leader or organizer pursuant to U.S.S.G. § 3B1.1(a) is a factual finding that we review for clear error. *United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002). Section 3B1.1(a) of the Guidelines provides for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."[9] U.S.S.G. § 3B1.1(a). The guideline does not define "organizer" or "leader," but the commentary states that "the defendant must have been the organizer [or] leader . . . of one or more other participants." U.S.S.G. § 3B1.1, cmt. (n.2). "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, cmt. (n.4). "In distinguishing a leadership and organizational role from one of mere management or supervision," a court should consider:

> [(1)] the exercise of decision-making authority, [(2)] the nature of participation in the commission of the offense, [(3)] the recruitment of accomplices, [(4)] the claimed right to a larger share of the fruits of the crime, [(5)] the degree of participation in planning or

---

[9] Although Wilson disputes that the criminal activity in this case involved the requisite number of participants, he does not brief an argument on appeal challenging the district court's conclusion that the criminal enterprise was "otherwise extensive" under § 3B1.1(a). Rather, he only summarily lists the issue when discussing the enhancement in general. Consequently, he has waived any argument on the issue for failure to adequately brief it. *See United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) ("[Defendant], who is represented by appointed counsel, does nothing beyond listing these points of error—he offers no further arguments or explanation. This is a failure to brief and constitutes waiver.").

organizing the offense, [(6)] the nature and scope of
the illegal activity, and [(7)] the degree of control and
authority exercised over others.

U.S.S.G. § 3B1.1, cmt. (n.4). "The defendant need not have supervised each
and every coconspirator: 'Proof that the defendant supervised only one other
culpable participant is sufficient to make the defendant eligible for the
enhancement.'" *United States v. Curtis*, 635 F.3d 704, 720 (5th Cir. 2011)
(internal quotation marks and citation omitted). "The district court may find
that a defendant exercised a leader/organizer role by inference from the
available facts." *Cabrera*, 288 F.3d at 174.

In *United States v. Maes*, we agreed with the district court's reasoning
supporting its application of the organizer/leader enhancement in a situation
very similar to this one, quoting the following language from district court's
order:

> [The defendant] did exercise decision-making
> authority in terms of he controlled the supply of the
> methamphetamine and determined when it could be
> shipped. He organized and participated in the sense
> that he was obtaining the methamphetamine,
> packaging it, shipping it, and was also sending bank
> account information in order for deposits to be made
> to pay for this activity. He recruited other individuals
> to supply this bank information to him in some
> instances so he could use other accounts to try and
> hide some of the activity. And this was the subject of
> the money laundering counts, but it was all connected
> to the drug conspiracy and the shipment of the drugs.
> He was receiving large sums of money for these
> shipments of methamphetamine. And the nature and
> scope of the illegal activity, it was broad, it was
> surreptitious and designed to conceal. There were

> several layers that were used to conceal the activity,
> and it went on for a period of time.

961 F.3d 366, 378 (5th Cir. 2020). Hardly distinguishable from the facts which we observed supported the enhancement in *Maes*, the record here indicates that over the course of three years, from 2016 through 2018, Wilson was involved in the planning, organizing, and executing of a cross-country drug trafficking scheme spanning at least three states: California, Texas, and Mississippi. He routinely obtained large quantities of methamphetamine from an unknown source, packaged the methamphetamine in California, mailed the drugs to Bell and Swearengen in Mississippi, and provided them with pertinent tracking information to ensure they received the drug shipments. Both Bell and Swearengen paid Wilson for the drugs, and under Wilson's direction, Swearengen deposited large sums of illegal drug proceeds into various Texas bank accounts controlled by Wilson, splitting the deposited sums to help avoid detection. Wilson then withdrew the deposited sums by purchasing California cashier's checks made out to third parties on the accounts into which the cash had been deposited in Texas—another step designed to further conceal his connection to the drug proceeds.

During an intercepted call between Wilson and Singleton, the pair discussed methamphetamine and cocaine and Wilson referred to his "people down there," expressing his dissatisfaction with Bell because he was costing him a lot of money. The record further reflects that, during the same time period, Bell also sold methamphetamine for Mitchell and that Wilson would, at times, transfer money into Chambers's bank account on behalf of Bell (recall that Chambers was Mitchell's girlfriend at the time), for payment for methamphetamine. This activity was corroborated by both Mitchell and Chambers at trial.

In sum, Wilson played a significant role in organizing and leading an extensive multi-state conspiracy to distribute methamphetamine involving

five or more participants, *i.e.*, Wilson, Bell, Swearengen, Singleton, Chambers, and Mitchell, and he directed at least one of his accomplices, Swearengen, during the scheme. Accordingly, the record supports that not only were there at least five participants in this drug conspiracy scheme, but the scheme was also "otherwise extensive." For these reasons, we hold that the district court did not clearly err in applying the four-level leader/organizer enhancement to Wilson's sentence. *See Mauskar*, 557 F.3d at 232.

### (4) Obstruction-of-Justice Enhancement

Wilson also disputes the district court's application of the two-level obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 on grounds that he allegedly made threats to Bell, Swearengen, and Mitchell after trial but before sentencing. Wilson notes that at sentencing, he testified that he did not threaten his codefendants and that the Government presented no eye-witness testimony by anyone present during the alleged threats. Wilson further contends that because the Government did not indicate that it planned to call any of his codefendants to testify at sentencing, there was no expectation that of any of his codefendants would testify at that proceeding. Consequently, Wilson concludes, there is no evidence that his alleged threats were intended to obstruct his sentencing. His arguments are misplaced.

We review a factual finding that the defendant obstructed justice for clear error. *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Id*. Section 3C1.1 authorizes a two-level increase if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and if the obstructive conduct related to the offense of conviction. U.S.S.G. § 3C1.1.

Examples of covered conduct include "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, cmt. (n.4(A)).

Although Wilson appears to be correct that there was no prior indication that the Government intended to call Wilson's codefendants Bell, Swearengen, or Mitchell as witnesses at sentencing, there is also no indication from the Government that it did not plan to call these witnesses to testify. Thus, they were potential witnesses. As stated, Agent Rayner testified that he interviewed Bell, Swearengen, and Mitchell, who were housed in the same facility as Wilson, about death threats they had received from Wilson and they all explained that he made threatening hand gestures towards them, indicating that he intended to kill them or have them killed. Additionally, Bell stated that Wilson sent messages to him through other inmates that he planned to have Mexican inmates kill him or put a hit on him, and that Wilson expressed these same sentiments directly to Mitchell.

We have held that an agent's testimony regarding the statements of others describing the defendant's threats or intimidation toward them is sufficiently reliable to uphold application of the enhancement. *See United States v. West*, 58 F.3d 133, 138 (5th Cir. 1995) ("In this case, the district court had before it sufficient competent evidence to indicate that a sentence enhancement for obstruction of justice was warranted. [The defendant's] contention that testimony regarding the statements of others cannot be used to support the enhancement is not correct. We find no error in the district court's decision to credit the testimony of [the agent] and accept the factual conclusions of the PSI."). Accordingly, we hold that the district court did not clearly err in relying on Agent Rayner's testimony regarding Wilson's codefendants' statements to support its application of the two-level obstruction-of-justice enhancement.

No. 23-60101

### (5) Harmless Error

With respect to all of Wilson's sentencing arguments, the district court left no doubt that, even if its guidelines calculations were erroneous, it "would have imposed [the] same sentence as a variance based on the offense conduct in this case," Wilson's characteristics, and the 18 U.S.C. § 3553(a) sentencing factors. We have held that where the district court makes a "firm, plain, and clear" statement that the sentence imposed was appropriate, regardless of any guidelines error, as it did in this case, any purported error is harmless. *United States v. Reyna-Aragon*, 992 F.3d 381, 389 (5th Cir. 2021) (internal quotation marks and citation omitted). We hold the same here.

### D. Disproportionate Sentence

Last, Wilson argues that there is an obvious and unwarranted disparity between his 240-month sentence and Bell's sentence of 116 months, Swearengen's sentence of 90 months, and Mitchell's sentence of 66 months. According to Wilson, he and Mitchell engaged in similar conduct, *i.e.*, sending methamphetamine to Mississippi, and Bell and Swearengen were career criminals with no meaningful employment history, whereas Wilson had no significant criminal history and a long history of employment.

Our review of the district court's sentencing decision is limited to determining whether Wilson's sentence was reasonable. *Gall v. United States*, 552 U.S. 38, 46 (2007). Substantive reasonableness review is "based on the factors listed in § 3553(a)." *United States v. Peltier*, 505 F.3d 389, 392 (5th Cir. 2007), *abrogated on other grounds by Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020); 18 U.S.C. § 3553(a). Our "review is highly deferential as the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) with respect to a particular defendant." *United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008). We "presume [that] sentences within or below the calculated guidelines range

are reasonable." *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015). To rebut the presumption, a defendant must show that his sentence "does not account for a factor that should have received significant weight, [] gives significant weight to an irrelevant or improper factor, or [] represents a clear error of judgment in balancing sentencing factors." *Id.* at 558 (internal quotation marks and citation omitted).

Among the relevant § 3553(a) factors are "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "However, this disparity factor requires the district court to avoid only unwarranted disparities between similarly situated defendants nationwide, and it does not require the district court to avoid sentencing disparities between codefendants who might not be similarly situated." *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010). Nevertheless, a defendant may be able to establish substantive unreasonableness based on the existence of an unwarranted disparity in sentences if he can show that a similarly situated defendant received a lesser sentence. *See United States v. Armstrong*, 550 F.3d 382, 406 (5th Cir. 2008).

Here, Wilson fails to rebut the presumption of reasonableness that is afforded to his 240-month sentence, which was below the recommended guidelines sentence of life. *Simpson*, 796 F.3d at 557–58. "[A]voiding unwarranted general sentencing disparities is not a factor that [this court] grant[s] significant weight where the sentence is within the Guidelines range." *United States v. Naidoo*, 995 F.3d 367, 383 (5th Cir. 2021) (internal quotation marks and citation omitted). Moreover, Wilson makes no comparison between his conduct and that of similarly situated defendants nationwide. *See Guillermo Balleza*, 613 F.3d at 435.

Although Wilson contends that he and his codefendants received disparate treatment, he does not provide any facts establishing that he and the other defendants were otherwise similarly situated. Notably, he declined to take his third attorney's advice to take the Government's plea offer and insisted on proceeding to trial. In contrast, Bell, Swearengen, and Mitchell all pleaded guilty and promised to cooperate with the Government, receiving lighter sentences. Furthermore, the record indicates that Wilson was a leader or organizer of the conspiracy, and we have held that a more significant role in the scheme is an appropriate factor for a district court to consider when imposing a sentence that results in a disparity with the sentence of a codefendant. *See United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009) ("[The defendant] and [his codefendant], however, are not similarly situated, and are not appropriate points for comparison in a reasonableness analysis . . . [The codefendant] received a downward departure for substantial assistance, and [the defendant] had a much more significant role in the scheme, reflected in the larger profits he received.").

In light of the foregoing, Wilson has failed to show that he was similarly situated to his codefendants. *See, e.g.*, *United States v. Ives*, 984 F.2d 649, 650 (5th Cir. 1993) (holding that disparate sentences between codefendants can be reasonably justified by "the degree of the defendant's involvement in a criminal enterprise"); *United States v. Duncan*, 919 F.2d 981, 992 (5th Cir. 1990) ("Defendants who enter into plea bargains agree to cooperate with the [G]overnment in exchange for a known result that they consider favorable. They are in an entirely different position from those who submit their cases to a jury and take their chances on the jury's decisions."); *see also United States v. Lopez*, 392 F. App'x 245, 257 (5th Cir. 2010) (unpublished) (affirming disparate sentences because the defendant had a role as a leader or organizer and also insisted on going to trial whereas his codefendants pleaded guilty and cooperated with the Government).

No. 23-60101

Accordingly, we hold that Wilson's substantive reasonableness argument also fails.

### III. CONCLUSION

For the foregoing reasons, Wilson's convictions and sentence are AFFIRMED.